UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEV PATEL, | No. 2:15-cv-02471-KJN |
| Plaintiff, | |
| v. | ORDER |
| STATE OF CALIFORNIA DEPARTMENT OF PUBLIC HEALTH AND DEPARTMENT OF TOXIC SUBSTANCES, | |
| Defendant. | |

I.      INTRODUCTION

Plaintiff Dev Patel ("plaintiff") commenced this action on November 30, 2015, alleging racial and national origin discrimination, harassment, retaliation, and failure to prevent by defendants California Department of Public Health ("CDPH") and California Department of Toxic Substances Control ("DTSC"), pursuant to Title VII, 42 U.S.C. § 2000e and California's Fair Employment and Housing Act ("FEHA"), California Government Code § 12940.[1]  (See ECF Nos. 1, 4.)

_____

[1] This action proceeds before the undersigned pursuant to the parties' consent to the jurisdiction of a United States Magistrate Judge for all further proceedings in this case, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c)(1).  (ECF Nos. 11, 13, 14.)

On February 1, 2018, defendants filed a motion for summary judgment or, in the alternative, summary adjudication.  (ECF No. 48.)  Plaintiff filed an opposition to defendants' motion and defendants filed a reply.  (ECF Nos. 59, 65.)  Plaintiff also filed a response and evidentiary objections to defendants' separate statement of material facts.  (ECF Nos. 60–64.)  On April 26, 2018, the court took this matter under submission on the briefs without oral argument. (ECF No. 66.)

After carefully considering the parties' written briefing, the court's record, and the applicable law, the court GRANTS defendants' motion for summary judgment for the following reasons.

II.     RELEVANT BACKGROUND

The background facts and evidence are largely undisputed.  To the extent that any material factual dispute exists, the court resolves the dispute in plaintiff's favor for the limited purpose of adjudicating this motion for summary judgment.[2]

Plaintiff, who was born in India and identifies as Indian, was an employee of the State of California at all times relevant to this matter.  (Deposition of Dev Patel, ECF Nos. 48-4, 48-6 ["Patel Dep."] 19:10–14; 31:7–38:24).  In particular, plaintiff's claims center around his employment at defendant agencies CDPH and DTSC from July 2009 through June 11, 2014.

A.     Employment at CDPH

Plaintiff began working for CDPH in July 2009, as an associate governmental program analyst ("AGPA").  (Complaint, ¶ 4; Patel Dep. 32:18–20.)  Plaintiff began in a limited term position but later obtained a permanent position.  (Patel Dep. 46:13–20.)  Plaintiff was never formally counseled or disciplined while at CDPH.  (Patel Dep., 53:4–8, 379:15–380:13; Declaration of Lance Reese, ECF No. 48-10 ["Reese Decl."], ¶¶ 6, 7; Declaration of Addie Aguirre, ECF 48-8 ["Aguirre Decl."], ¶ 17.)

Plaintiff never heard his supervisors at CDPH make any racial slurs or derogatory comments about race.  (Patel Dep., 120:7–121:14.)  Mandeep Sohi, who is Indian and also

---

[2] Plaintiff has submitted a statement of disputed facts (ECF No. 61), to the extent that the court does not explicitly discuss a disputed fact, it is deemed to be immaterial.

worked at CDPH during the relevant period, did not feel that he was discriminated against on the basis of race or national origin, nor did he observe other minorities being treated differently. (Deposition of Mandeep Sohi, ECF No. 48-14 ["Sohi Dep."] 20:14–22:11.)

During the relevant period, Addie Aguirre was the Staff Services Manager-II ("SSM-II") of the unit where plaintiff worked. (Deposition of Adelina Lucas Aguirre, ECF No. 48-5 ["Aguirre Dep."] 23:22–23.) Ms. Aguirre was born in Ivory Coast, Africa and identifies as Cape Verdean. (Aguirre Dep., 13:22–23, 17:18–18:4.) Ms. Aguirre approved plaintiff's appointment as a permanent employee at CDPH. (Aguirre Decl. ¶ 4.) Plaintiff was never denied a raise at CDPH, and he received all of his normal step raises while Ms. Aguirre was the SSM-II of his unit. (Patel Dep., 55:23–56:18, 69:16–18; Aguirre Decl., ¶ 5)

From August 2010, through the relevant period, Lance Reese was the Staff Services Manager-I ("SSM-I") of the unit where plaintiff worked, and served as plaintiff's direct supervisor. (Reese Decl., ¶¶ 1–3.)

Ms. Aguirre had a circle of friends at work who she treated favorably. (Deposition of Brian Barrick, ECF No. 48-14 ["Barrick Dep."] 14:21–17:10.) This circle of friends consisted of people from various races, such as Hispanic (Annabelle Ruiz, Gloria Madrid, and Saundra Valverde), Chinese (Tina Fong), German/Caucasian (Lorri Silva), and African-American (Annette Dobie). (Id.; Sohi Dep., 31:10–21; Patel Dep., 169:17–170:2, 284:18–23; Aguirre Decl., ¶ 22.)

Plaintiff believes that Ms. Aguirre directed some of her circle of friends to spy on him, but admits that he has no direct evidence of this allegation. (Patel Depo., 169:17–172:19, 173:13–23, 174:24–175:1.) On one occasion, as plaintiff was returning from a break, Ms. Dobie was outside the building and went inside as soon as she saw plaintiff, presumably spying on him. (Id. at 170:13–18.) Then, on another occasion, someone reportedly lied to Mr. Reese that plaintiff had left a staff meeting and not come back. (Id. at 170:21–171:14.)

In June and July 2012, plaintiff saw Ms. Aguirre laughing during one or two birthday gatherings, while plaintiff sang the "happy birthday" song in his own language. (Patel Dep., 120:9–121:10.) "[E]verybody laughed and giggled" when plaintiff sang the song. (Id. at 121:1–

5; Barrick Dep., 21:17–22.)  Plaintiff ceased attending birthday parties because he felt very embarrassed.  (Id.)  However, Ms. Aguirre sent for and directed plaintiff to attend and sing at the next birthday party.  (Id.)

In December 2012, Mr. Reese notified plaintiff that it was important to receive a specific assignment no later than December 7, 2017.  (Patel Dep., 374:18–376:13; Deposition of Lance Reese, ECF No. 48-5 ["Reese Dep."] 28:20–29:14, 84:17–85:24.)  Plaintiff emailed the assignment to Mr. Reese, but not Ms. Aguirre at the end of the work day on December 6, 2017.  (Patel. Dep., 374:18–376:13.)  Plaintiff called in sick on December 7, 2017.  (Id. at 125:2–12.)

That morning, Ms. Aguirre noticed that she did not have plaintiff's assignment and that neither Mr. Reese nor plaintiff were in the office.  (Aguirre Dep., 80:25–81:15.)  Ms. Aguirre called plaintiff's cell phone number and plaintiff did not answer.  (Id. at 81:23.)  She then obtained plaintiff's emergency contact phone number, called his wife, and asked about plaintiff's whereabouts.  (Id. at 81:23–82:15; Deposition of Dimple Patel, ECF No. 48–14 ["Dimple Dep."] 15:7–23.)  Plaintiff's wife told Ms. Aguirre that plaintiff was sick and that she should not be calling, when plaintiff had already called in sick.  (Dimple Dep., 16:15–17:9.)  After plaintiff returned to the office, Ms. Aguirre reportedly told him that his sick leave could be denied.  (Patel Dep., 177:14–25.)  However, plaintiff was never denied any sick leave or other time off at CDPH.  (Id.)

During December 2012, plaintiff and two other AGPAs were assigned additional work by supervisors Ms. Aguirre, Mr. Reese, and Ms. Dobie, in order to assist with a backlog of assignments in the department.  (Reese Decl. ¶ 6; Aguirre Decl., ¶ 16.)  The three supervisors attempted to meet with plaintiff on December 11, 2012, in Ms. Aguirre's office to assess plaintiff's workload.  (Aguirre Dep., 56:17–57:11; Patel Dep., 155:22–158:20.)  When plaintiff saw all three supervisors in the meeting room, he was convinced that he was going to be reprimanded.  (Patel Dep., 158:14–17.)  He refused to continue the meeting without union representation, and he left the meeting without permission.  (Id.)

On December 19, 2012, Mr. Reese issued an informal counseling memorandum to document the incident and plaintiff's behavior, which Mr. Reese deemed to be insubordinate.

4

(Reese Decl., ¶ 6; Patel Depo., 155:22–156:7, Exh. H.)  The informal counseling memo was not placed in plaintiff's official personnel file.  (Patel Depo., 51:8–18.)  As a result of the memo, plaintiff did not lose any pay, was not demoted, and did not suffer any other adverse consequences.  (Id. at 50:25–55:2; Reese Decl., ¶¶ 6–7.)

At some other time around December 2012, Ms. Aguirre came to plaintiff's cubicle demanding to know the status of a spreadsheet he was working on.  (Patel Dep., 136:1–138:22, 162:11–163:3.)  She shoved him out of the way to look at the spreadsheet on his computer.  (Id.)  Then, around April 2013, Ms. Aguirre threw some claim files down on plaintiff's desk that she wanted him to work on.  (Patel Dep., 139:10–140:25.)  Ms. Aguirre also reportedly removed an ergonomic chair from plaintiff's cubicle, which was later replaced.  (Id. at 143:5–21.)

After work, on May 9, 2013, plaintiff saw Ms. Aguirre walking the same direction as him when he was walking to the bus stop and he assumed that Ms. Aguirre was following him.  (Patel Dep., 148:2–149:5.)  The next day, plaintiff's cellular phone was missing from work.  He speculates, without offering any evidence, that Ms. Aguirre had something to do with its disappearance.  (Patel Dep., 149:6–18, 151:2–152:20.)  On May 13, 2013, plaintiff applied for a temporary restraining order against Ms. Aguirre in Sacramento County Superior Court related to these events, which the court denied.  (Patel Dep., 148:2–150:20, 153:8–154:14.)

### 1. **Unsuccessful Promotional Applications**

Plaintiff applied for various promotional positions as an SSM-I while he was employed at CDPH.  In July of 2010, plaintiff applied for an SSM-I position in the Drinking Water Program at CDPH.  (Aguirre Decl., ¶ 6.)  Ms. Aguirre was the hiring manager for the position.  (Id.)  A panel consisting of Ms. Aguirre, Lorri Silva, and Leah Walker interviewed several candidates for the position, including plaintiff.  (Patel. Dep., 61:23–66:4; Aguirre Decl., ¶ 7.)

Three interviewees received higher aggregate interview scores from the panel than plaintiff:  Lance Reese scored 271; Wendy Nelson scored 266; Joshua Ziese scored 265; and plaintiff scored 239.  (Aguirre Decl., ¶ 7; Declaration of Leah Walker, ECF No. 48-12 ["Walker Decl."] ¶ 4, Declaration of Lorri Silva, ECF No. 48–11 ["Silva Decl."] ¶ 2.)

////

1    Presumably, Ms. Aguirre had been at CDPH long enough to know how to manipulate an

2    interview panel to ensure that her favored candidate would score the highest, although there is no

3    evidence that Ms. Aguirre did so here.  (See Deposition of Monica Wilson-Pough, ECF No. 48-14

4    ["Wilson-Pough Depo"] 21:9–22:25; Sohi Depo., 22:13–25:20, Barrick Depo., Pp. 17:1–18:25.)

5        As the top scoring candidates, Mr. Reese and Ms. Nelson were selected to participate in a

6    second round of interviews with a panel consisting of Dat Tran, Ms. Dobie, Kelvin Yamada, and

7    Ms. Aguirre.  (Aguirre Decl., ¶¶ 10–11.)  The panel selected Mr. Reese for the position.  (Id.)

8        In May of 2011, plaintiff interviewed for another SSM-I position in the Operations

9    Certification Unit at CDPH.  (Aguirre Decl., ¶ 13.)  The interview panel for the position consisted

10   of Ms. Aguirre, Ms. Wilson-Pough, and Mr. Reese.  (Aguirre Dep., 35:20–36:3; Reese Decl., ¶

11   4.)

12       Ms. Wilson-Pough testified that plaintiff performed extremely well at his interview.

13   (Wilson-Pough Depo., 17:12–23:2.)  At the same time, the record demonstrates that at least four

14   other individuals scored higher than plaintiff, based upon the aggregate scoring of the interview

15   panel:  Michael Rohner scored 245.5; Mary Howard scored 243.5; Michelle Woods scored 241;

16   Teresa Owens scored 236; and plaintiff scored 224.  (Aguirre Decl., ¶ 13, Reese Decl., ¶ 4.)

17   Alice Webber, who was selected for the position, presumably scored higher than all candidates,

18   but her interview scores were lost.  (Reese Decl., ¶ 4.)  Ms. Aguirre was not the hiring manager

19   and did not make the final decision to hire Ms. Webber.  (Aguirre Decl., ¶ 13; Wilson-Pough

20   Dep., 54:7–14.)

21       On July 18, 2011, plaintiff was offered an SSM-I position at the East End Complex within

22   CDPH, after a second interview.  (Declaration of Frieda Taylor, ECF No. 48-11 ["Taylor Decl."]

23   ¶ 3.)  However, the hiring manager later notified plaintiff that she could not offer him the position

24   because the Department's "SROA" (State Restriction of Appointments) list had not been cleared,

25   and they had to choose a candidate off of that list first.  (Id.)  The hiring at the East End Complex

26   apparently did not follow the normal hiring process for the State, where an employer is supposed

27   to clear the SROA list before scheduling interviews and offering someone a position.  (Patel Dep.,

28   61:7–22.)

Ms. Aguirre knows a lot of people at the East End Complex and plaintiff alleges that she might have told the hiring supervisor not to hire plaintiff. (Patel Dep., 61:18–20.) On at least one occasion, Ms. Aguirre was overheard in the office asking where plaintiff was applying and then saying that he was not going to get a promotion, if she could help it. (Deposition of Kathleen Elizondo, ECF No. 64-2 ["Elizondo Depo."] 18:20–20:7.) Plaintiff admits that he has no knowledge of whether Ms. Aguirre actually interfered with the position at the East End Complex, or any other position. (Patel Dep., 61:21–22.)

Plaintiff also applied for other SSM-I positions during the relevant period, but did not keep track of where he applied. (Patel Dep., 59:13–60:1.) Plaintiff admits that he does not know why he did not get any of these other promotions. (Patel Dep., 60:2–6.)

2.    **Plaintiff's Complaints at CDPH**

Plaintiff made his first complaint about Ms. Aguirre on December 11, 2012, to CDPH's Office of Labor Relations. (Patel Dep., 128:8–129:4, 290:4–14, 294:1–18, Exhs. A, F, Z.) Thereafter, plaintiff made various other complaints about Ms. Aguirre and Mr. Reese to CDPH management in late 2012 and 2013, alleging harassment, discrimination, and retaliation. (Patel Dep., 121:25–125:5, 129:8–135:6, 306:14–23, 316:22–318:24.)

CDPH's Office of Civil Rights investigated plaintiff's complaints. (Patel Dep., 307:18–308:15; Aguirre Dep., 52:23–53:4; Reese Decl., ¶ 8.) No findings were ever sustained that anyone at CDPH committed unlawful discrimination, retaliation, or harassment. (Patel Dep., 113:15–114:1; Aguirre Decl., ¶ 18; Reese Decl., ¶ 8]

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against CDPH on January 8, 2013. (Patel Dep., 304:16–305:15, Exh. AA.)

B.    Employment at DTSC

Plaintiff left CDPH after receiving a position as an SSM-I at DTSC in June 2013. (Patel Dep., 32:21–33:7; 71:5–15.) Sandra Poindexter and Andrew Collada made the decision to hire plaintiff. (Patel Dep., 71:5–15, 74:16–75:8; Declaration of Sandra Poindexter, ECF No. 48-9 ["Poindexter Decl."] ¶ 2; Declaration of Andrew Collada, ECF No. 48-9 ["Collada Decl."] ¶ 2.)

Roselyn Cope, who is Caucasian and was already employed at DTSC, also applied and interviewed for the SSM-I position that plaintiff received. (Collada Decl., ¶ 2.; Deposition of Roselyn Cope, ECF No. 64-11 ["Cope Dep."] 16:1–21.) Ms. Poindexter told Ms. Cope that "she had no choice in the matter" when it came to hiring plaintiff. (Cope Dep., 18:5–14.)

At DTSC, Ms. Poindexter was plaintiff's first line supervisor and Mr. Collada was his second line supervisor. (Patel Dep., 73:25–74:15.) Plaintiff supervised four staff members: Carlos Aceituno; Ms. Cope; Annette Stark; and Connie Turner. (Patel Dep., 72:15–23; Deposition of Sandra Poindexter, ECF No. 48-5 ["Poindexter Dep."] 16:4–13.) When plaintiff was hired, his staff had a history of not following DTSC policy and taking long breaks and lunches. (Collada Dec., ¶ 5.) Mr. Collada expected plaintiff would begin to correct some of those problems with his staff. (Id.)

Beginning on September 23, 2013, and over the next several months, plaintiff reported various staff issues—including staff taking long breaks and lunches—to Ms. Poindexter, Mr. Collada, and DTSC human resources. (Patel Dep., 76:9–78:5, 322:1–323:23; Deposition of Andrew Collada, ECF No. 48-5 ["Collada Dep."] 22:22–24:23, 56:20–57:8, 66:6–67:16.)

In early October 2013, Ms. Poindexter directed plaintiff to get his staff's work hours for some work expectation guidelines she was establishing. (Poindexter Dec. ¶ 10; Collada Decl., ¶ 12.) Ms. Poindexter explicitly instructed plaintiff not to obtain a schedule of his staff's meal and rest periods. (Id.) Nevertheless, plaintiff asked his staff for their meal and rest period schedules, and staff complained. (Id.) Ms. Poindexter also instructed plaintiff not to do anything about certain instances of employees coming in early to make up time, while Mr. Collada had directed plaintiff to stop staff time abuse. (Poindexter Dep., 44:3–15; Declaration of Dev Patel, ECF No. 63 ["Patel Decl."] ¶18.)

Plaintiff wanted to issue a counseling memorandum to Ms. Turner in October 2013 for misuse of state time, perceived "insubordination," and other conduct. (Collada Decl., ¶ 11; Patel Dep., 81:4–84:3.) Mr. Collada believed plaintiff's draft counseling memorandum was "not well organized, excessively long and confusing," and he instructed plaintiff to confer with DTSC human resources regarding the memorandum. (Collada Decl., ¶ 11; Collada Dep., 31:14–34:10;

Patel Dep., 85:19–86:5.)  DTSC human resources determined that plaintiff had not followed the proper steps for progressive discipline, especially since Ms. Turner had no prior formal disciplinary record, and that the conduct did not rise to the level of formal discipline.  (Collada Decl., ¶ 11.)  Therefore, DTSC human resources determined that the draft counseling memorandum should not be issued.[3]  (Id.; Poindexter Dep., 45:10–47:5; Patel Dep., 85:19–86.)

On October 23, 2013, Plaintiff sent an email to a union job steward who represented plaintiff's staff.  (Collada Decl., ¶ 13.)  Mr. Collada considered this email inappropriate and a potential violation of California law and the memorandum of understanding between the union and the State.  (Id.)

### 1.  **Complaints Against Plaintiff**

Plaintiff's staff filed various complaints against him, during his time as an SSM-I at DTSC.  Ms. Turner and others complained to DTSC management that, on September 30, 2013, plaintiff went throughout the office, trying to locate Ms. Turner and interrupting staff's work.  (Poindexter Decl., ¶ 7. Collada Decl., ¶ 9; Deposition of Connie Turner, ECF No. 48-6 ["Turner Dep."] 26:7–23.)  Ms. Turner also reported to DTSC management that, on October 9, 2013, plaintiff sent her an email that she felt was "harassment, demeaning, dengrading [sic], rude, condescending, out of line, disrespectful, chauvinistic, etc., etc."  (Collada Decl., ¶ 10; Poindexter Decl., ¶ 8.)

Staff filed other complaints with Ms. Poindexter, centering around two main issues: "(1) plaintiff was needlessly taking them away from their desks to discuss issues privately behind closed doors, which was wasting their time; and (2) plaintiff was yelling at them and not treat[ing] them politely."  (Poindexter Decl., ¶ 8; Collada Decl., ¶ 10; see also Poindexter Dep., 25:22–27:14, 31:7–13; Turner Dep., 24:15–25:2, 32:22–37:11, 58:19–60:3, 63:21–64:3; Cope Dep., 25:6–28:20, 30:7–24.)

---

[3] Plaintiff disputes this determination and maintains that he did follow the proper steps for progressive discipline.  (Patel's Decl., ¶ 9.)  However, what is relevant for the determination of the pending motion is that DTSC human resources made these findings, not whether the findings were wise or correct.  See Guz v. Bechtel Nat. Inc., 24 Cal. 4th 317, 358 (2000) ("if nondiscriminatory, [the employer]'s true reasons need not necessarily have been wise or correct).

Between October and December of 2013, plaintiff's staff also filed complaints with the Office of Civil Rights as well as two union grievances, concerning plaintiff's conduct. (Collada Decl., ¶ 15; Poindexter Decl., ¶ 12; Turner Dep., 63:21–64:3; Cope Dep., 30:7–24; Deposition of Annette Stark, ECF No. 48-14 ["Stark Dep."] 24:2–26:6, 40:14–18.)

## 2. **Counseling and Probation Reports**

After receiving complaints about plaintiff, Ms. Poindexter met with plaintiff in an attempt to address the complaints and to suggest more constructive ways to interact with his staff. (Poindexter Decl., ¶ 8.) Ms. Poindexter felt that plaintiff was unwilling to accept her direction. (Id.) Because of the complaints, Ms. Poindexter and Mr. Collada instructed plaintiff to submit any emails to Ms. Poindexter for review, before sending them to staff. (Collada Decl., ¶ 17. Poindexter Decl., ¶ 13.)

During a discussion with Mr. Collada and Ms. Poindexter, one of them used an "American slang" term that plaintiff did not understand. (Patel Dep., 107:17–109:6.) When plaintiff asked what it meant, they laughed and Ms. Poindexter said "you're not from America, so you don't understand. Forget about it." (Id. at 108:16–19.) Plaintiff does not specifically recall whether this slang term was any sort of racial slur. (Id. at 108:22–109:6.)

Ms. Poindexter prepared a draft probation report for plaintiff that she intended to issue in October 2013. (Poindexter Decl., ¶ 14; Collada Decl., ¶ 18.) Mr. Collada instructed her to revise the probation report, which was completed and issued to plaintiff on December 12, 2013. (Id.; Patel Dep., 204:20–206:8.) In the report, plaintiff was rated as "unacceptable" in the areas of administrative ability and communication; "improvement needed" in the areas of relationships with people, attitude, and ability as a supervisor; and "improvement needed" as an overall rating. (Collada Decl., ¶ 18; Poindexter Decl., ¶ 14; Patel Dep., 199:17–200:24, Exh. K.)

Ms. Poindexter and Mr. Collada began meeting with plaintiff together, in an attempt to address his performance issues. (Collada Decl., ¶ 20; Poindexter Decl., ¶ 17.; Patel Dep., 92:7–13.) At some point during these meetings, Ms. Poindexter told plaintiff that he might want to start looking for another job. (Patel Dep., 107:19–20, 192:12–14.) Mr. Collada did not feel that plaintiff was "receptive or cooperative" during these meetings, and he did not believe that

plaintiff showed any improvement. (Collada Decl., ¶ 20.) Therefore, in his second probation report, issued on March 7, 2014, plaintiff was given the same ratings that he received in his first probation report. (Collada Decl., ¶ 20; Poindexter Decl., ¶ 17; Patel Dep., 224:7–24, Exhs., O, P.)

Mr. Collada began holding bi-weekly one-on-one meetings with plaintiff in an attempt to address what he perceived to be plaintiff's performance deficiencies. (Collada Decl., ¶ 21; Patel Dep., 92:7–13.) Mr. Collada informed plaintiff that he expected plaintiff to "hold his staff accountable." (Id.)

On April 9, 2014, plaintiff sent an email to Mr. Collada and youth aid, Gabriel Okamoto, in which plaintiff complained of Ms. Poindexter's "unfair, illegal & discriminatory disciplinary practices." (Collada Decl., ¶ 22; Patel Dep., 384:1–24, Exh., S.) Mr. Collada believed that it was inappropriate to include Mr. Okamoto on this email because such a low-level employee should not be privy to confidential personnel issues, such as complaints of discrimination. (Id.) Plaintiff thought it was appropriate because Mr. Okamoto was Mr. Collada's executive staff assistant and was responsible for coordinating Mr. Collada's schedule. (Patel Decl., ¶4.)

On April 28, 2014, Mr. Collada issued plaintiff a counseling memorandum because he concluded that "[p]laintiff failed to acknowledge what [Mr. Collada] believe[d] to be serious staff and/or EEO issues in a timely manner, failed to use good judgment, and failed to behave professionally and accept what [Mr. Collada] believed to be constructive feedback." (Collada Decl., ¶ 22; Patel Dep., 245:19–247:15, Exh. S.)

On May 9, 2014, Mr. Collada issued a second counseling memorandum because he concluded that "[p]laintiff was still not adequately addressing performance problems in his unit and was not timely communicating issues in his unit that needed to be addressed." (Collada Decl., ¶ 23; Patel Dep., 249:24–252:16, Exh. T.)

On May 28, 2014, Mr. Collada issued a third counseling memorandum because he concluded that "[p]laintiff was still not adequately addressing issues within his unit, such as assisting one of his staff with potential leave balance . . . issues, failing to adequately manage a staff conflict between Roselyn Cope and Annette Stark," and making comments Mr. Collada concluded to be threats of retaliation against plaintiff's staff for exercising their union rights.

1    (Collada Decl., ¶ 24; Patel Dep., 252:17–253:4, Exh. U.)

2           Subsequently, Mr. Collada recommended that plaintiff be rejected on probation because

3    he concluded that plaintiff had not demonstrated the requisite management and leadership skill, or

4    the requisite improvement that Mr. Collada had expected.  (Collada Decl., ¶ 25.)  As a result,

5    DTSC issued plaintiff a Notice of Rejection During Probationary Period, effective June 11, 2014.

6    (Collada Decl., ¶ 25; Patel Dep., 238:1–240:4, Exh. P.)

7           Mr. Collada and Ms. Poindexter never explicitly indicated that any of their actions against

8    plaintiff were because of his race or national origin, or in response to any of plaintiff's

9    complaints.  (Patel Dep., 107:17–108:11.)

10                          3.      **Plaintiff's Complaints at DTSC**

11          On December 31, 2013, after receiving his first probation report, plaintiff filed a

12   complaint with the Office of Civil Rights indicating that he believed Ms. Poindexter was

13   discriminating against him.  (Patel Dep., 101:10–18, Exh. B.)  Plaintiff raised various other

14   complaints in 2014 about his staff and his perception that Ms. Poindexter was treating him

15   unfairly.  (Patel Dep., 109:7–112:22, 320:19–25, 338:4–24, 340:14–365:5, Exhs. B, E.)

16          Plaintiff also filed workplace violence complaints against Ms. Cope and Ms. Stark for

17   threatening to go to the union about certain language plaintiff put in their duty statements, and

18   against Ms. Poindexter for pointing at him and speaking to him in a loud voice.  (Patel Dep.,

19   262:2–266:1, Exh. W.)  Plaintiff admits that he was never threatened with any physical violence.

20   (Id.)  DTSC investigated these complaints and found there to be no violation of the policy against

21   workplace violence.  (Id.)

22          Plaintiff filed charges of discrimination with the EEOC against DTSC on April 8, 2014,

23   and November 11, 2014.  (Patel Dep., 305:19–306:13, Exh. AA.)

24          Plaintiff asserts that Desa Donahue, a Caucasian manager then supervised by Ms.

25   Poindexter, was treated more favorably than plaintiff.  (Patel Dep., 337:10–338:11.)  Unlike

26   plaintiff, Ms. Donahue was a permanent employee, her staff did not file any union grievances or

27   other complaints against her, and she was not observed exhibiting poor communication with

28   subordinates or failing to timely address potentially serious employee performance issues.

(Collada Decl., ¶ 27.)

Plaintiff also speculates that other former DTSC employees who were not Caucasian might have also been discriminated against. (Patel Dep., 348:12–352:2.) Plaintiff admits that he does not know why these employees no longer work at DTSC. (Patel Dep. 351:18–352:2.)

C.     Procedural History

Plaintiff commenced this action on November 30, 2015. (ECF No. 1) Plaintiff filed the first amended complaint on January 15, 2016, bringing claims against CDPH and DTSC under Title VII, 42 U.S.C. § 2000e and the FEHA, California Government Code § 12940. (ECF No. 4.) The first amended complaint asserts the following claims: racial and national origin discrimination under Title VII and the FEHA (claims one and two) against all defendants; retaliation under Title VII and the FEHA (claims five and six) against all defendants; harassment because of national origin or race under Title VII and the FEHA (claims seven and eight) against CDPH; and failure to prevent under the FEHA (claim nine) against all defendants.[4] (Id.)

III.     DISCUSSION

A.     Legal Standard for Motions for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." It further provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[5] A shifting burden of proof governs motions for summary judgment under Rule 56. Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010). Under summary judgment practice, the moving party:

////

---

[4] The parties stipulated to the dismissal of plaintiff's gender discrimination and harassment claims without prejudice. (ECF No. 44 at 2.)

[5] Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010. However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." In re Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").

If the moving party meets its initial responsibility, the opposing party must establish that a genuine dispute as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986). To overcome summary judgment, the opposing party must demonstrate the existence of a factual dispute that is both material, i.e., it affects the outcome of the claim under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1031 (9th Cir. 2010), and genuine, i.e., "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010) (quoting Anderson, 477 U.S. at 248). A party opposing summary judgment must support the assertion that a genuine dispute of material fact exists by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[6] Fed. R. Civ. P. 56(c)(1)(A)-(B). However, the opposing party "must show more than the

---

[6] "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

14

1    mere existence of a scintilla of evidence." In re Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing

2    Anderson, 477 U.S. at 252).

3          In resolving a motion for summary judgment, the evidence of the opposing party is to be

4    believed. See Anderson, 477 U.S. at 255. Moreover, all reasonable inferences that may be drawn

5    from the facts placed before the court must be viewed in a light most favorable to the opposing

6    party. See Matsushita, 475 U.S. at 587; Walls v. Cent. Contra Costa Transit Auth., 653 F.3d 963,

7    966 (9th Cir. 2011). However, to demonstrate a genuine factual dispute, the opposing party

8    "must do more than simply show that there is some metaphysical doubt as to the material facts. . .

9    Where the record taken as a whole could not lead a rational trier of fact to find for the non-

10   moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87 (citation

11   omitted).

12          B.      Plaintiff's Evidentiary Objections

13          "A party may object that the material cited to support or dispute a fact cannot be presented

14   in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). At summary

15   judgement "a party does not necessarily have to produce evidence in a form that would be

16   admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil

17   Procedure 56." Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (quoting Block v. City

18   of Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001)) (internal quotation marks omitted). Even

19   if evidence is presented in a form that is currently inadmissible, the court may still evaluate that

20   evidence on a motion for summary judgment so long as the objections could be cured at trial. See

21   Burch v. Regents of the Univ. of Cal., 433 F.Supp.2d 1110, 1119–20 (E.D. Cal. 2006).

22          Here, plaintiff objects to portions of various declarations submitted by defendants in

23   support of their motion for summary judgment, on the basis that certain statements contain

24   irrelevant information, are inadmissible hearsay, and lack foundation.[7] (See ECF Nos. 60, 62.)

25   _____

26   [7] Defendants also filed numerous objections on hearsay and other grounds to plaintiff's statement
     of disputed facts in opposition to the motion for summary judgment. (ECF No. 65.) However,
27   because consideration of the objected-to evidence does not impact the court's resolution of the
     motion under the applicable summary judgment standards, the court finds it unnecessary to rule
28   on the objections.

First, the court declines to address any of plaintiff's relevance objections.  (See ECF No. 60.)  Because the court may rely only on relevant evidence in addressing the motion, its citation to evidence subject to a relevance objection means the objection has been overruled.  Mayes v. Kaiser Found. Hospitals, 2014 WL 2506195, at *2 (E.D. Cal. June 3, 2014); Burch v. Regents of Univ. Of Cal., 433 F.Supp.2d 1110, 1119 (E.D. Cal. 2006) (stating that relevance objections are redundant because a court cannot rely on irrelevant facts in resolving a summary judgment motion); see also Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013).

Second, plaintiff asserts that various statements in the declarations of Andrew Collada, Sandra Poindexter, Lance Reese, and Leah Walker are inadmissible hearsay, lack foundation, and/or are barred by the best evidence rule.  (See ECF No. 62.)  However, plaintiff's objections are boilerplate references to the Federal Rules of Evidence, and do not include any argument or analysis regarding each piece of evidence.  Furthermore, to the extent that any of these statements are inadmissible hearsay, defendants could cure the objections at trial by calling the actual declarants of those statements to testify.  See Burch, 433 F.Supp.2d at 1119–20.  Similarly, plaintiff's objections that certain statements lack foundation are not persuasive.  Each declarant indicates that he or she has personal knowledge of the content of each of the disputed statements.  It is also possible that defendants could lay a proper foundation for each of these statements at trial with supplemental testimony and/or authenticated documents.

Therefore, plaintiff's evidentiary objections are overruled for the purpose of resolving the instant motion.

C.     Claims Against CDPH

1.     **Discrimination**

Both Title VII and the FEHA make it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1); Cal. Gov. Code § 12940(a).[8]

---

[8] Because the FEHA is generally interpreted consistently with Title VII, see Guz v. Bechtel N Inc., 24 Cal. 4th 317 (2000), the court conducts its analysis of both plaintiff's federal and state

"[A]n individual suffers disparate treatment when he or she is singled out and treated less favorably than others similarly situated on account of race." McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1121 (9th Cir. 2004) (internal citations and quotations marks omitted)

To establish a prima facie case of discrimination under Title VII and the FEHA, a plaintiff must offer evidence that "'give[s] rise to an inference of unlawful discrimination,' either through the framework set forth in McDonnell Douglas Corp. v. Green or with direct or circumstantial evidence of discriminatory intent." Vasquez v. Cty. of Los Angeles, 349 F.3d 634, 640 (9th Cir. 2003), as amended (Jan. 2, 2004) (internal citations omitted).

Under the McDonnell Douglas framework, unlawful discrimination is presumed if a plaintiff can show: "(1) that the plaintiff belongs to a class of persons protected by Title VII [and the FEHA]; (2) that the plaintiff performed his or her job satisfactorily; (3) that the plaintiff suffered an adverse employment action; and (4) that the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff." Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1028 (9th Cir. 2006) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).

i.    *Adverse Employment Action*

The United States Supreme Court has described an adverse employment action for purposes of a Title VII discrimination claim as "a significant change in employment status, such as . . . firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). An adverse employment action "inflicts direct economic harm" in most cases. Id. at 762. California courts have similarly determined what constitutes adverse employment action under the FEHA. See Wilson v. Murillo, 163 Cal. App. 4th 1124, 1134–35 (Cal. Ct. App. 2008) ("[T]he 'adverse employment action' threshold is met when the employer's action impact[s] the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way. . . . Examples include discharge, demotions, refusal to hire, nonrenewal of contracts, and

discrimination and retaliation claims according to Title VII case law, except when the standards under the FEHA substantially differ.

17

failure to promote").

Here, plaintiff applied for and did not receive three SSM-I positions within CDPH. Failing to promote generally does constitute an adverse employment action. See Burlington Indus., Inc., 524 U.S. at 761. Moreover, before a plaintiff may bring a civil action under the FEHA, he must first exhaust his administrative remedies by filing a charge with the Department of Fair Employment and Housing ("DFEH") within one year of the alleged adverse employment action. Cal. Gov't Code §§ 12960, 12965(b); Martin v. Lockheed Missiles & Space Co., 29 Cal. App. 4th 1718, 1724, (1994). This same timing requirement applies to plaintiff's Title VII claims where, as here, plaintiff filed a charge jointly with the DFEH and the EEOC. 42 U.S.C.A. § 2000e-5(1).

On January 8, 2013, plaintiff filed his charge of discrimination against CDPH. (Patel Dep., 304:16–305:15, Exh. AA.) Thus, only acts occurring after January 8, 2012, are actionable because the charge of discrimination must be filed within one year of any alleged adverse employment action. Each of the three unsuccessful promotions in the record—at the Drinking Water Program, at the Operations Certification Unit, and at the East End Complex—is a position that plaintiff applied for and failed to obtain in either 2010 or 2011, well before January 8, 2012. (See Aguirre Decl., ¶¶ 6, 10-11, 13; Reese Decl., ¶ 4; Taylor Decl. ¶ 3.) As a result, plaintiff is time-barred from relying on these failed promotions, which are not actionable as a matter for law. See Cal. Gov't Code §§ 12960, 12965(b); 42 U.S.C.A. § 2000e-5(1).

Plaintiff asserts that the record also contains evidence that Ms. Aguirre withheld good references from plaintiff and prevented him from receiving a promotion outside of CDPH. (See Elizondo Depo. 18:20–20:7.) However, the evidence in the record would not allow a reasonable trier of fact to find that Ms. Aguirre withheld good references in relation to any specific job that plaintiff applied for, after January 8, 2012. Plaintiff admits that he did not keep track of the other places where he applied. (Patel Dep., 59:13–60:1.) Indeed, the only other specific promotional opportunity in the record, aside from the three time-barred positions, is the position that plaintiff actually obtained with DTSC. (Patel Dep., 32:21–33:7; 71:5–15.) Thus, plaintiff cannot point to any specific promotional opportunity after January 8, 2012, that Ms. Aguirre allegedly prevented

18

1    him from obtaining.

2          Plaintiff's complaint is otherwise predicated on occurrences that do not constitute adverse

3    employment actions, as a matter of law:  plaintiff's speculation that Ms. Aguirre directed

4    employees to spy on him (Patel Depo., 169:17–172:19); Ms. Aguirre's call to plaintiff's wife

5    when plaintiff was out sick (Aguirre Dep., 81:23–82:15); Ms. Aguirre's threat that plaintiff's sick

6    leave could be denied (Patel Dep., 177:14–25); plaintiff and two other AGPAs being assigned

7    additional work, in order to assist with a backlog (Reese Decl. ¶ 6; Aguirre Decl., ¶ 16); the

8    December 19, 2012 informal counseling memorandum by Mr. Reese (Reese Decl., ¶ 6; Patel

9    Depo., 155:22–156:7, Exh. H); Ms. Aguirre directing plaintiff to sing the "happy birthday" song

10   and laughing at plaintiff when he sang (Patel Dep., 120:9–121:10); Ms. Aguirre shoving plaintiff

11   out of the way to look at his computer (id. at 136:1–138:22, 162:11–163:3); Ms. Aguirre throwing

12   some claim files down on plaintiff's desk (id. at 139:10–140:25.); Ms. Aguirre removing and later

13   replacing an ergonomic chair from plaintiff's cubicle (id. at 143:5–21); Ms. Aguirre walking the

14   same direction as plaintiff one day after work (id. at 148:2–149:5); plaintiff's speculation that Ms.

15   Aguirre had something to do with the disappearance of his cell phone (id. at 149:6–18, 151:2–

16   152:20).

17         None of these occurrences—alone or in concert—created a significant change in

18   plaintiff's employment status.  Of note, the December 19, 2012 informal counseling

19   memorandum was not placed in plaintiff's permanent file and did not result in any loss in pay or

20   change in employment.  (Patel Depo., 50:25–55:2.)  Moreover, it is undisputed that plaintiff was

21   never formally disciplined at CDPH.  (Patel Dep., 53:4–8, 379:15–380:13.)  Indeed, plaintiff

22   received all his step raises while employed by CDPH, and was never denied any sick leave or

23   vacation.  (Patel Dep., 55:23–56:18, 69:16–18, 177:14–25.)

24         Therefore, plaintiff has failed to demonstrate that CDPH took any actionable adverse

25   employment action for the purposes of racial discrimination under Title VII or the FEHA.  See

26   Burlington Indus., Inc., 524 U.S. at 761; Wilson, 163 Cal. App. 4th at 1134–35.

27   ////

28   ////

Even assuming that there were an actionable adverse employment action, plaintiff has failed to demonstrate that CDPH acted on the basis of race or national origin.  "Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome."  Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).  Thus, to establish a prima facie case, plaintiff must establish that the adverse employment action was taken on account of his race or national origin.  See Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335–36 (1977); Guz v. Bechtel Nat. Inc., 24 Cal. 4th 317, 355 (2000).

Plaintiff's alleged evidence of racial and national origin animus is purely speculative.  The assertion that plaintiff was left out of Ms. Aguirre's circle of friends due to his race has no support in the record, especially since her alleged circle of friends was racially diverse.  (See Barrick Dep., 14:21–17:10; Sohi Dep. 31:10–21; Patel Dep., 169:17–170:2, 284:18–23; Aguirre Decl., ¶ 22.)  Plaintiff admits that he never heard his supervisors at CDPH make any racial slurs or derogatory comments about race or national origin.  (Patel Dep., 120:7–121:14.)  Moreover, Mandeep Sohi, who also worked at CDPH and is Indian, did not feel that he was discriminated against on the basis of race or national origin, nor did he observe any other minorities being treated differently on the basis of race or national origin.  (Sohi Dep., 20:14–22:11.)

The only evidence even remotely related to plaintiff's race or national origin, during his nearly four year employment at CDPH, is that Ms. Aguirre and other employees laughed at plaintiff on two or three occasions when he sang the "happy birthday" song in his native language, and that Ms. Aguirre directed plaintiff to sing this song on one of the occasions.  (Patel Dep., 120:9–121:10; Barrick Dep., 21:17–22.)  As insensitive as the laughter may have been, these instances are not sufficient to establish a causal nexus between any alleged adverse employment actions and plaintiff's race or national origin.  See, e.g., Manatt v. Bank of America, NA, 339 F.3d 792, 798 (9th Cir. 2003) (holding that two incidents of co-workers making fun of plaintiff's pronunciation because of ethnicity and racially offensive gestures by other employees occurring over a span of two-and-a half years did not establish race harassment claim); Vasquez,

349 F.3d at 644 (finding no hostile environment discrimination where the employee was told he had "a typical Hispanic macho attitude," and that he should work in the field because "Hispanics do good in the field" and where he was yelled at in front of others).

Plaintiff has not provided more than a mere scintilla of evidence that his race or national origin motivated any of CDPH's actions. Therefore, a reasonable jury could not conclude that there is a causal nexus between plaintiff's race or national origin and any of CDPH's alleged adverse employment actions. See FreecycleSunnyvale, 626 F.3d at 514.

iii. <em>Legitimate Reason and Pretext</em>

Even if plaintiff had established a prima facie case of discrimination, this only creates a presumption that CDPH undertook the challenged employment action because of plaintiff's race. "To rebut this presumption, the defendant must produce admissible evidence showing that the defendant undertook the challenged employment action for a 'legitimate, nondiscriminatory reason.'" Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1028 (9th Cir. 2006). "In the context of employment discrimination law under Title VII, summary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's race." Id.

Importantly, "if nondiscriminatory, [the employer]'s true reasons need not necessarily have been wise or correct. [. . .] While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with a motive to discriminate illegally." Guz, 24 Cal. 4th at 358 (emphasis in the original) (internal citations omitted). Rude or insensitive behavior by an employer is not enough, by itself, to establish a violation of the FEHA or Title VII. See Lyle v. Warner Bros. Television Prods., 38 Cal. 4th 264, 295 (2006) ("We simply recognize that, like Title VII, the FEHA is 'not a "civility code" and [is] not designed to rid the workplace of vulgarity'"); Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).

There is evidence in the record that plaintiff did not receive each of three time-barred promotions based upon legitimate reasons. The interview panel for the SSM-I position in the

Drinking Water Program scored three other applicants higher than plaintiff.  (See Aguirre Decl., ¶ 7; Walker Decl. ¶ 4; Silva Decl. ¶ 2.)  Similarly, the panel for the Operations and Certification Unit scored at least four other applicants higher than plaintiff.  (See Aguirre Decl., ¶ 13, Reese Decl., ¶ 4.)  Further, plaintiff was informed that he did not receive the position at the East End Complex because the department had to first clear the SROA list.  (See Taylor Decl. ¶ 3.)  Plaintiff's speculation that Ms. Aguirre could have manipulated these interview panels and could have influenced the hiring managers at the East End Complex is not sufficient to establish any genuine issue of material fact as to the legitimate reasons proffered regarding these failed promotions.

The record also demonstrates that Mr. Reese issued the December 19, 2012 informal counseling memo because Mr. Reese felt that plaintiff was insubordinate when he left a meeting without permission.  (Reese Decl., ¶ 6; Patel Depo., 155:22–156:7, Exh. H.)  Plaintiff does not dispute that he left the meeting in question.  (Patel Dep., 158:14–17.)

Additionally, even assuming that Ms. Aguirre did not like plaintiff and treated him rudely on multiple occasions, such conduct is not a violation of Title VII or the FEHA, which are not civility codes.  See Oncale, 523 U.S. at 80; Lyle, 38 Cal. 4th at 295.

CDPH has demonstrated that the record establishes legitimate reasons for its alleged adverse employment actions.  Plaintiff has failed to point to any facts in the record that would allow a reasonable jury to conclude that CDPH's legitimate reasons were merely a pretext and that its actions were indeed based upon plaintiff's race or national origin because, as explained, the record does not contain more than a mere scintilla of evidence that any action by CDPH was based upon plaintiff's race or national origin.  See Cornwell, 439 F.3d at 1028.

### 2.    **Retaliation**

Title VII and the FEHA also prohibit retaliation against a person who exercised his rights under Title VII of the Civil Rights Act of 1964 by claiming discrimination or seeking to enforce the Act's provisions.  42 U.S.C. § 2000e-3(a); Cal. Gov. Code § 12940(h).  In order to meet his burden in a case of retaliation under Title VII and the FEHA, the plaintiff-employee must plead and prove three elements:  (1) his involvement in a protected activity under Title VII proceedings;

(2) his further mistreatment or discharge by the defendant-employer; and (3) the existence of a causal connection between the original Title VII action and the mistreatment or discharge. EEOC v. Hacienda Hotel, 881 F.2d 1504, 1512 (9th Cir. 1989) (overruled on other grounds); Westendorf v. West Coast Contractors of Nevada, Inc., 712 F.3d 417, 422 (9th Cir. 2013).

Plaintiff's first protected activity was his December 11, 2012 complaint to CDPH's Office of Labor Relations.  (Patel Dep., 128:8–129:4, 290:4–14, 294:1–18, Exhs. A, F, Z.)  Accordingly, plaintiff's retaliation claims may only be predicated on actions that occurred after that date.

The anti-retaliation provision of Title VII exists to prevent employer interference to the Title VII remedies.  Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 63 (2006).  Therefore, the provision only covers employer actions that "would have been materially adverse to a reasonable employee or job applicant."  Id. at 57.  In contrast with the definition of an adverse action in the discrimination context, which must affect the employee's terms and conditions of employment, an adverse employment action in the retaliation context "must be harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination."  Id.; Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000).  Materiality of the challenged action is judged from the perspective of a reasonable person in the plaintiff's position considering all the circumstances.  Burlington Northern, 548 U.S. at 71.

The FEHA differs slightly here, requiring the same standard as a Title VII discrimination claim: an adverse action "must materially affect the terms, conditions, or privileges of employment."  Yanowitz v. L' Ore al  USA, Inc., 36 Cal. 4th 1028, 1052 (2005).  Therefore, for the same reasons discussed above, plaintiff has failed to demonstrate any adverse employment action for the purpose of a retaliation claim under the FEHA.

As to plaintiff's Title VII retaliation claim, the only alleged adverse actions after December 11, 2012, that plaintiff points to are the alleged instances of Ms. Aguirre failing to provide good references for plaintiff when he applied for other promotional positions.  (See ECF No. 59. At 17.)  As explained above, however, the record does not contain any evidence regarding specific jobs that plaintiff applied for during this timeframe.  Therefore, the record lacks evidence

23

that would allow a reasonable jury to conclude that Ms. Aguirre withheld good references after December 11, 2012, to support a retaliation claim.

The court notes that the record also includes other actions that occurred after December 11, 2012. Specifically, the December 19, 2012 informal counseling memorandum (Reese Decl., ¶ 6; Patel Depo., 155:22–156:7, Exh. H), as well as various instances of Ms. Aguirre coming to plaintiff's cubical in late 2012 and early 2013, rudely interacting with plaintiff (Patel Dep., 136:1–138:22, 139:10–140:25, 162:11–163:3, 310:19–312:8). Yet, as also explained above, this counseling memorandum was provided for legitimate business reasons and Ms. Aguirre's alleged rude behavior is not sufficient by itself to demonstrate a violation of Title VII or the FEHA. See Oncale, 523 U.S. at 80; Lyle, 38 Cal. 4th at 295.

Accordingly, plaintiff has failed to produce sufficient evidence to support a prima facie claim of retaliation under Title VII or the FEHA. Moreover, even if he had established a prima facie case, plaintiff has failed to point to any facts in the record that would allow a reasonable jury to conclude that CDPH's legitimate reasons were merely a pretext and that its actions were indeed based upon retaliation. See Cornwell, 439 F.3d at 1028

### 3. **Harassment**

To state a prima facie case of unlawful harassment under Title VII and the FEHA, a plaintiff must demonstrate "(1) that he was subjected to verbal or physical conduct of a racial . . . nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." Reynaga v. Roseburg Forest Prod., 847 F.3d 678, 686 (9th Cir. 2017). Importantly, a plaintiff must demonstrate verbal or physical harassment that has the purpose or effect of creating a hostile work environment on account of the employee's inclusion in a protected classification. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78–81 (1998); Lyle v. Warner Bros. Television Prods., 38 Cal. 4th 264, 280–81 (2006).

Here, as explained, plaintiff has not proffered sufficient evidence to demonstrate that any of CDPH's actions were based upon plaintiff's race or national origin. Therefore, a reasonable jury could not conclude that plaintiff was harassed because of his race or national origin. Indeed,

24

plaintiff admits that he never heard any racial slurs or derogatory comments (Patel Dep., 120:7–121:14) and Mandeep Sohi, who is also Indian, testified that he did not feel discriminated against and did not observe any other minorities being discriminated against at CDPH.  (Sohi Dep., 20:14–22:11.)

The record does establish however that, over the nearly four years plaintiff was employed at CDPH, he was laughed at up to three times when singing "happy birthday" in his own language and that he was treated rudely by Ms. Aguirre.  (Patel Dep., 120:9–121:10; Barrick Dep., 21:17–22.)  Even assuming that this conduct were based upon plaintiff's race or national origin, it was not sufficiently severe or pervasive to satisfy a hostile work environment claim.  See Manatt, 339 F.3d at 798 (holding that two incidents of co-workers making fun of plaintiff's pronunciation because of ethnicity and racially offensive gestures by other employees occurring over a span of two-and-a half years did not establish race harassment claim); Vasquez, 349 F.3d at 644 (finding no hostile environment discrimination where the employee was told he had "a typical Hispanic macho attitude," and that he should work in the field because "Hispanics do good in the field" and where he was yelled at in front of others).

### 4.  **Failure to Prevent**

To establish a failure to prevent claim under the FEHA, a plaintiff must first demonstrate that he was discriminated against, retaliated against, or harassed.  Trujillo v. N. Cty. Transit Dist., 63 Cal. App. 4th 280, 289 as modified (May 12, 1998).  Therefore, because plaintiff cannot maintain a claim against CPDH for discrimination, retaliation, or harassment, he cannot maintain a claim against CDPH for failure to prevent.

D.    Claims against DTSC

### 1.  **Discrimination**

It is clear that plaintiff suffered adverse employment actions at DTSC.  Plaintiff received multiple unsatisfactory probation reports and counseling memoranda, he was rejected on probation, and he was terminated effective June 11, 2014.  (Collada Decl., ¶ 25; Patel Dep., 238:1–240:4, Exh. P.)

////

i.    *Causal Nexus*

As explained, "[w]hatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." Hazen Paper Co., 507 U.S. at 610 (1993).

Plaintiff's proffered evidence of racial or national origin animus at DTSC is largely speculative. At DTSC, plaintiff was not subjected to any overtly racist actions or statements. (Patel Dep., 107:17–108:11.) During one discussion with his supervisors, one of them used an "American slang" term that plaintiff did not understand. (Patel Dep., 107:17–109:6.) When plaintiff asked what it meant, they laughed and Ms. Poindexter said "you're not from America, so you don't understand. Forget about it." (Id. at 108:16–19.) It is unclear what this term was, and if it had anything to do with race or national origin, or if it was simply a term that plaintiff did not understand.

Ms. Donahue, a Caucasian manager who was also supervised by Ms. Poindexter, was allegedly treated more favorably than plaintiff. (Patel Dep., 337:10–338:11.) Plaintiff also speculates, without proffering any evidence, that other non-Caucasian employees who were no longer working at DTSC might have been discriminated against. (Patel Dep., 348:12–352:2.) Additionally, plaintiff claims that Ms. Poindexter treated the Caucasian individuals under plaintiff's direct supervision more favorably than she treated plaintiff. (ECF No. 59 at 19.)

Importantly, plaintiff's scant evidence of a causal nexus here is fatally undermined by the same actor inference. "[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action." Coghlan v. Am. Seafoods Co. LLC., 413 F.3d 1090, 1096 (9th Cir. 2005); see West v. Bechtel Corp., 96 Cal. App. 4th 966, 980 (2002), as modified on denial of reh'g (Apr. 5, 2002). "From the standpoint of the putative discriminator, '[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.'" West, 96 Cal. App. 4th at 981. For the purpose of the same actor inference, courts have interpreted "a short period " to mean as many as five years between the hiring and firing of an employee. See

Id.; Coghlan, 413 F.3d at 1097.

Ms. Poindexter and Mr. Collada made the decision to hire plaintiff at DTSC, passing up the opportunity to hire a Caucasian employee, Ms. Cope who also applied for the position. (Patel Dep., 71:5-15, 74:16–75:8; Poindexter Dep. 14:2–16:3; Collada Decl. ¶ 2.) Plaintiff was rejected during his probationary period and terminated within a year of being hired. (Collada Decl., ¶¶ 2, 25.) Therefore, because Ms. Poindexter and Mr. Collada hired and later fired plaintiff within the same year, there is a strong inference that their actions were free from discriminatory intent. See Coghlan, 413 F.3d at 1096–97; West, 96 Cal. App. 4th at 980–81.

Plaintiff asserts that this inference should not be applied because Ms. Cope testified that Ms. Poindexter claimed that "she had no choice in the matter" when it came to hiring plaintiff for the SSM-I position, rather than Ms. Cope. (Cope Dep., 18:5–14; see ECF No. 59 at 21.) However, it is unclear what Ms. Poindexter meant with this statement—Did Mr. Collada actually make the decision to hire plaintiff? Had plaintiff performed so much better than Ms. Cope at the interview that Ms. Poindexter had to offer him the job? Was Ms. Poindexter simply trying to spare Ms. Cope's feelings? In any event, such evidence does not remove the same actor inference.

"The same[]actor inference is neither a mandatory presumption (on the one hand) nor a mere possible conclusion for the jury to draw (on the other). Rather, it is a "strong inference" that a court must take into account on a summary judgment motion." Coghlan, 413 F.3d at 1098. Moreover, even assuming that Ms. Poindexter's statement significantly weakened the inference as to her, it has not affected the inference as to Mr. Collada. Importantly, it was Mr. Collada who was ultimately responsible for rejecting plaintiff during probation. (Collada Decl., ¶ ¶ 2, 25.)

Plaintiff's highly speculative evidence of discriminatory intent, discussed above, is not sufficient to overcome the same actor inference. Plaintiff's strongest piece of evidence here is that Ms. Donahue, a Caucasian manager, was treated more favorably than him. (Patel Dep., 337:10–338:11.) However, even this piece of evidence is not sufficient to overcome the same actor inference.

////

27

For the purpose of a discrimination claim, "individuals are similarly situated when they have similar jobs and display similar conduct." Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1157 (9th Cir. 2010). In Hawn, a group of male pilots sued their employer after they were fired in response to a complaint that they had sexually harassed a female pilot by "an array of conduct including sexualized banter, crude jokes, and the sharing of crude and/or pornographic emails and websites." Id. at 1153. The male pilots sued for race, sex, and national origin discrimination and alleged that female flight attendants who had engaged in similar sexual conduct were treated more favorably because they were not terminated. Id., at 1154–55. Even though the same decision-maker decided to terminate the male pilots, but not the female flight attendants, the court held that the employees were not similarly situated. Id., at 1159–60. The court concluded that "plaintiffs and the female flight attendants [we]re distinguishable because plaintiffs' conduct gave rise to a complaint of sexual harassment, while the female flight attendants' alleged conduct did not." Id. at 1160. The court noted that the "presence of complaints has also been deemed a valid distinguishing factor by other circuits." Id. (citing, Yeager v. City Water & Light Plant, 454 F.3d 932, 934 (8th Cir. 2006), and Morrow v. Wal-Mart Stores, Inc., 152 F.3d 559, 560 (7th Cir. 1998)). Thus, because the male pilots' conduct had given rise to complaints of harassment and the female employees' similar conduct had not, the Ninth Circuit determined that the two groups were not similarly-situated and, on that basis, affirmed summary judgment. Id. at 1161.

Likewise, Ms. Donahue and plaintiff, while both managers at DTSC, are not similarly situated in this matter. Much like in Hawn, plaintiff was the subject of numerous complaints and union grievances by his staff (Poindexter Decl., ¶ 8; Collada Decl., ¶ 10; Turner Dep., 24:15–25:2, 32:22–37:11, 58:19–60:3, 63:21–64:3; Cope Dep., 25:6–30:24), whereas Ms. Donahue's staff did not file any complaints or union grievances against her (Collada Decl., ¶ 27). Additionally, Ms. Donahue was a permanent employee at DTSC, whereas plaintiff did not make it past his probationary status. (Collada Decl., ¶ 27.) Furthermore, DTSC management observed that plaintiff exhibited poor communication with his subordinates and failed to timely address potentially serious employee performance issues, whereas DTSC management did not observe any such issues with Ms. Donahue. (Collada Decl., ¶ 27; Poindexter Decl., ¶ 20).

Thus, for the purpose of establishing a casual nexus between plaintiff's protected status and DTSC's adverse employment actions against him, it is irrelevant how DTSC management treated Ms. Donahue because Ms. Donahue and plaintiff are not similarly situated,.

In light of the scant record and the strong same actor inference, plaintiff has failed to proffer sufficient evidence to demonstrate a casual nexus between his race or national origin and DTSC's adverse employment actions.  See Coghlan, 413 F.3d at 1096–97; West, 96 Cal. App. 4th at 980–81.  Therefore, a reasonable jury could not conclude that any of DTSC's alleged adverse employment actions were on account of plaintiff's race or national origin.  See FreecycleSunnyvale, 626 F.3d at 514.

ii.    *Legitimate Reasons and Pretext*

Even assuming that plaintiff could maintain a prima face case of discrimination against DTSC, defendants have supplied legitimate reasons for the adverse employment actions, and plaintiff has failed to demonstrate that these legitimate reasons were pretextual.  See Cornwell, 439 F.3d at 1028.

The record documents a long list of actions by plaintiff that Mr. Collada and Ms. Poindexter felt justified their actions, including plaintiff receiving poor probation reports, counseling memoranda, and plaintiff's own attempt at a counseling memorandum was found to be "not well organized, excessive[ly] long and confusing" and DTSC human resources determined that it should not be issued because plaintiff had not followed the proper steps for progressive discipline (Collada Decl., ¶ 11); plaintiff failed to follow Ms. Poindexter's explicit instructions (Poindexter Dec. ¶ 10; Collada Decl., ¶ 12); plaintiff sent an email to a union job steward that Mr. Collada considered to be inappropriate and a potential violation of California law and the memorandum of understanding between the union and the State (Collada Decl., ¶ 13); plaintiff's staff made numerous complaints against him (Poindexter Decl., ¶ 8; Collada Decl., ¶ 10); Ms. Poindexter and Mr. Collada felt that plaintiff was unwilling to accept their direction (Poindexter Decl., ¶ 8; Collada Decl., ¶ 20); plaintiff included Mr. Collada's assistant on an email that contained confidential personnel information (Collada Decl., ¶ 22); and plaintiff failed to adequately manage his staff and made comments that Mr. Collada concluded to be

threats of retaliation against staff for exercising their union rights (Collada Decl., ¶ 24).

Plaintiff was issued his first probation report on December 12, 2013, and rated "unacceptable" in the areas of administrative ability and communication; "improvement needed" in the areas of relationships with people, attitude, and ability as a supervisor; and "improvement needed" as an overall rating. (Collada Decl., ¶ 18; Poindexter Decl., ¶ 14.) Plaintiff's second probation report was issued on March 7, 2014, and showed no change in plaintiff's ratings, even after his supervisors had met with him in an attempt to improve his performance. (Collada Decl., ¶ 20; Poindexter Decl., ¶ 17.)

Ms. Collada subsequently met with plaintiff twice a week. (Collada Decl., ¶ 21.) Not seeing any improvement, and noticing more issues—such as sending confidential personnel information to Mr. Collada's executive assistant—Mr. Collada issued plaintiff three counseling memoranda. (Collada Decl., ¶¶ 22–24.) Thereafter, plaintiff was rejected on probation because Mr. Collada concluded plaintiff had not demonstrated the requisite management and leadership skill, or the requisite improvement that was expected. (Collada Decl., ¶ 25.)

Plaintiff has failed to demonstrate how these well-documented reasons for taking action against plaintiff were pretextual.

> An employee can prove pretext either: (1) directly, by showing that unlawful discrimination more likely motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable.

Mayes v. WinCo Holdings, Inc., 846 F.3d 1274, 1280 (9th Cir. 2017). Plaintiff attempts to broadly characterize the office as one where non-Caucasian employees were treated poorly and where Ms. Poindexter's racism "infected the workplace." (ECF No. 59 at 23.) However, as explained, the evidence of racial or national origin animus is scant at best, and plaintiff may not rely on DTSC's treatment of Ms. Donahue to demonstrate pretext because she is not similarly situated to plaintiff. As such, plaintiff's proffered evidence does not demonstrate that DTSC's motivation was likely unlawful discrimination, especially in light of the same actor inference.

Moreover, plaintiff has not proffered any evidence sufficient to show that DTSC's explanations were internally inconsistent or otherwise unbelievable. Plaintiff alleges that he

30

received different directions from Ms. Poindexter and Mr. Collada—that he should allow staff to make up time, but that he should also stop staff time abuse—and that his supervisors were essentially setting him up to fail.  (See Patel Decl. ¶18.)  However, as explained, an employer's actions do not have to be wise or correct as long as they are non-discriminatory.  See Guz, 24 Cal. 4th at 358.

Ms. Poindexter also reportedly once told plaintiff that he ought to start looking for another job.  (Patel Dep., 107:19–20, 192:12–14.)  Yet, this isolated rude and insensitive statement is of no moment, as Title VII and the FEHA are not civility codes.  See Oncale, 523 U.S. at 80; Lyle, 38 Cal. 4th at 295.

Therefore, plaintiff has failed to point to any facts in the record that would allow a reasonable jury to conclude that DTSC's legitimate reasons were merely a pretext and that its actions were indeed based upon plaintiff's race or national origin.  See Cornwell, 439 F.3d at 1028.

### 2.  Retaliation

On December 31, 2013, plaintiff filed his first complaint against DTSC for discrimination, after receiving his first unsatisfactory probation report.  (Patel Dep., 101:10-18, Exh. B.)  This complaint was plaintiff's first protected activity for the purposes of a retaliation claim.  See Hacienda Hotel, 881 F.2d at 1512; Westendorf, 712 F.3d at 422.

"To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that h[is] protected activity was the likely reason for the adverse action."  Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982).  Mere temporal proximity between the employer's knowledge of a protected complaint and a subsequent adverse employment action can be sufficient evidence of causality to establish a prima facie case of retaliation.  See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).

However, courts have determined that when an employee was subjected to a course of adverse action that *began before* the employee filed a protected complaint, and which *continued after* the employer learned of the complaint, one cannot infer—based on temporal proximity alone—that the complaint was the likely reason for the course of adverse action.  See Hollowell

v. Kaiser Found. Health Plan of the Nw., 705 F. App'x 501, 504 (9th Cir. 2017) (holding that plaintiff's "reliance on temporal proximity to show causation [in a retaliation claim] fail[ed] because one of the adverse actions . . . was the next step in a continuing course of action that began before [plaintiff] filed the internal complaint, and the others occurred four or more months after the filing of the internal complaint"); Johnson v. Nordstrom, Inc., 260 F.3d 727, 735 (7th Cir. 2001) (holding that where "there was 'no ratcheting up of the harassment' after the complaint was filed, the complaint could not have been the cause of the allegedly retaliatory conduct" and plaintiff therefore, failed to state a prima facie case of retaliation; see also Arteaga v. Brink's, Inc., 163 Cal. App. 4th 327, 353 (2008) ("temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination. . . . especially . . . where the employer raised questions about the employee's performance before he [engaged in a protected activity] and the subsequent termination was based on those performance issues).

Here, plaintiff relies on temporal proximity alone between his December 31, 2013 complaint and the subsequent adverse employment actions by DTSC to show the requisite causal link for his retaliation claim. (See Patel Dep., 95:18–97:21, ECF No. 59 at 24.) However, plaintiff received his first negative probation report on December 12, 2013 (Poindexter Decl., ¶ 14; Collada Decl., ¶ 18), a couple weeks before plaintiff filed his first protected complaint on December 31, 2013. (Patel Dep., 101:10-18, Exh. B.) Thereafter, plaintiff's subsequent probation reports demonstrated no improvement. Indeed, as explained, DTSC management documented numerous legitimate reasons for the continued negative probation reports, as well as the counseling memoranda, and plaintiff's ultimate rejection on probation.

Therefore, because plaintiff was subjected to a continuing course of adverse employment action that began before he filed any protected complaint, temporal proximity alone is not sufficient to state a prima facie case of retaliation. See Hollowell, 705 F. App'x at 504 (9th Cir. 2017); see also Cohen, 686 F.2d at 796.

Moreover, even assuming that plaintiff could state a prima facie claim of retaliation, his claim would still fail because, as explained above, DTSC proffered legitimate non-discriminatory

reasons for its actions that plaintiff has failed to demonstrate are pretextual.

###### 3. **Failure to Prevent**

As with plaintiff's failure to prevent claim against CDPH, because plaintiff cannot maintain a discrimination or retaliation claim against DTSC, he cannot maintain a failure to prevent claim against DTSC.  See <u>Trujillo</u>, 63 Cal. App. 4th at 289.

## V. CONCLUSION

Viewing the record as a whole, and drawing all reasonable inferences in a light most favorable to plaintiff, this is not a close case.  Defendants' arguments are well taken, and as a matter of law, plaintiff has failed to proffer sufficient evidence such that a reasonable jury could find that he was subjected to discrimination, retaliation, or harassment by either CDPH or DTSC.

Accordingly, for the reasons outlined above, IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment (ECF No. 48) is GRANTED.

2. The Clerk of Court shall vacate all scheduled dates, close this case, and enter judgment for defendants.

IT IS SO ORDERED.

Dated:  August 16, 2018

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

14/15.2471.Patel v. State of Cal.order MSJ